| | | |
|---|---|---|
| **TIMOTHY JAMES DONAHUE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's *pro se* Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1).

## I.      BACKGROUND

Petitioner was indicted along with co-defendants Osman White, Roderick Hardin, Leo McIntyre, Jr., Abdul White, and Otis Sutton in a Hobbs Act conspiracy. The charges pertaining to Defendant are: Count (1), conspiracy to commit Hobbs Act robbery; Count (2), Hobbs Act robbery and aiding and abetting the same; and Count (4), money laundering conspiracy. (3:12-cr-13, Doc. No. 71). The Government moved to dismiss Count (4) before trial, which the Court granted. (3:12-cr-13, Doc. No. 144); see (minute order of December 3, 2012, granting the Motion to Dismiss).

The facts of the case as recited by the Fourth Circuit Court of Appeals are as follows:

> Scott Beaver owned Beaver Honda and Salvage, a business that sold cars and used auto parts all over the United States and beyond. The Beaver family home and the business shared a single address. On one side of the road were the house and the car lot, separated by a fence. Directly across the road were the salvage yard and garage. Beaver's wife, who also worked for the business, sometimes prepared paperwork and conducted telephone sales and purchases from inside the house.

> Instead of putting his money in a bank, Beaver chose to keep it in a safe in his laundry room. In the evening after work, Beaver would bring the proceeds from

1

the business into the house for storage in the safe. He estimated that he had $1.5 million in the safe. He kept the cash from his business in the safe in part because he felt like it was safer there than stored in a bank or invested, and in part for convenience because he used it "for transactions." Although the business had a checking account, occasionally Beaver would retrieve cash from inside the house to pay people who performed work for him.

Donahue met Beaver when Donahue was employed by Eric Wilson in Wilson's automobile glass business. Wilson and Donahue performed work for Beaver, exchanging glass windshields at Beaver's car lot. Donahue knew that Beaver kept cash from the business inside his house. Wilson preferred being paid in cash, and often he and Donahue waited in the house or on the front porch as Beaver retrieved money to pay them for their windshield work. Sometimes, when the two men waited in the living room, Beaver headed towards the laundry room, returning with their cash. Donahue and Wilson occasionally discussed that Beaver was worth several million dollars, and Donahue remarked "quite a few times" about how much money Beaver kept in the safe.

Donahue conspired with others to rob Beaver's safe. The robbery was carried out on July 21, 2011, by two of the co-conspirators. The robbers forced Beaver, his wife, their two young daughters, Beaver's adult grandson, and Beaver's preschool-age great grandson, into the Beavers' home and demanded that Beaver show them the safe. After Beaver opened the safe, the robbers took the cash; it took several trips to carry it all to their vehicle. They began counting the money after they left the scene, but they stopped counting after $1.5 million. The funds were subsequently divided amongst the coconspirators.

United States v. Donahue, 607 Fed. Appx. 233, 233–34 (4th Cir. 2015).

Petitioner's co-defendants entered guilty pleas[1] and two of them, Osman White and Roderick Hardin, testified at Petitioner's trial. They explained that Petitioner had several robbery targets, the first being the Beaver family. The group recruited individuals to obtain a car, weapons, and carry out the robbery which was executed by Hardin and Sutton. The Government played several recorded phone conversations among the conspirators, both before and after the Beavers' robbery. Osman White and Hardin testified that Petitioner was the point man for the robbery and provided information about the Beavers, their home, their dog, their schedule, and a large amount

---

[1] Abdul White was originally charged in case number 3:12-cr-13 but was then transferred to case number 3:12-cr-375.

of cash expected to be found in their safe. The recorded conversations, which contained codes for robberies and the robbery participants, discussed the Beavers' robbery, other prospective targets, and the splitting of proceeds with Petitioner having received between $13,000 and $19,000.

Petitioner testified in his own defense. (3:12-cr-13, Doc. No. 290 at 111). He explained that the recorded conversations were about Osman coming to work with Petitioner in his auto glass business and that his reference to a windfall referred to his business picking up, not the Beavers' robbery. He testified that he did not discuss any kind of robbery with Osman, Hardin, Abdul, McIntyre, or Sutton at any time, or believe that they were going to rob the Beavers. (3:12-cr-13, Doc. No. 290 at 160).

Defense counsel argued in closing that the cooperating co-defendants were not credible because they were "playing a game with the system" by pleading guilty and cooperating with the Government. (3:12-cr-13, Doc. No. 291 at 21).

A jury found Petitioner guilty of Counts (1) and (2). (3:12-cr-13, Doc. No. 173). The Court sentenced him to 188 months, concurrent, followed by three years of supervised release. (3:12-cr-13, Doc. Nos. 253, 283). Petitioner argued on direct appeal that the evidence was insufficient to support his convictions. The Fourth Circuit affirmed. United States v. Donahue, 607 Fed. Appx. 233 (4th Cir. 2015). The United States Supreme Court denied certiorari on October 5, 2015. Donahue v. United States, 136 S.Ct. 187 (2015).

Petitioner filed the instant § 2255 Motion to Vacate on July 14, 2016, raising the following claims: (1) prosecutorial misconduct; (2) trial errors; (3) illegal restitution; and (4) ineffective assistance of trial counsel. (Doc. No. 1). The Court ordered the Government to show cause why relief should not be granted on Claims (1) and (4) and found that Claims (2) and (3) are not colorable. (Doc. No. 2). The Government filed a Response arguing that the prosecutorial

misconduct claims are procedurally barred and meritless, and that Petitioner failed to establish ineffective assistance of counsel.

## II.     SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  In many cases, an evidentiary hearing is required to determine whether or not counsel was ineffective for misadvising a petitioner about a plea offer. See generally United States v. Witherspoon, 231 F.3d 923, 926–27 (4th Cir. 2000); 28 U.S.C.A. § 2255(b). After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.     DISCUSSION

## (1)     Prosecutorial Misconduct

Petitioner contends that the prosecutor engaged in misconduct during trial by: (a) vouching for a witness and disparaging Petitioner's character during opening; (b) calling key government witnesses to testify at trial in orange prison garb; (c) vouching during closing; and (d) attempting to shift the burden of proof.

As a preliminary matter, this claim is procedurally defaulted from § 2255 review. "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Bousley v. United States, 523 U.S. 614, 621 (1998) (internal citations omitted) ("the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review."); United States v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001). In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, a petitioner must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack. See United States v. Frady, 456 U.S. 152, 167-68 (1982); United States v. Mikalajunas, 186 F.3d 490, 492–93 (4th Cir. 1999); United States v. Maybeck, 23 F.3d 888, 891-92 (4th Cir. 1994). Actual prejudice is then shown by demonstrating that the error worked to petitioner's "actual and substantial disadvantage," rather than just creating a possibility of prejudice. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). To establish cause based upon ineffective assistance of counsel, a petitioner must show that the attorney's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. See Murray, 477 U.S. at 488; Strickland, 466 U.S. at 687. In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a petitioner must show actual innocence by clear and convincing evidence. See Murray, 477 U.S. at 496.

Construing the *pro se* pleading liberally, Petitioner appears to allege that ineffective assistance of counsel is "cause" for excusing his procedural default of these claims. However, this contention fails because these claims are meritless and counsel was not ineffective for failing to

raise them. Therefore, the prosecutorial misconduct claims are procedurally defaulted from § 2255 review and, alternatively, fail on the merits for the reasons that follow.

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the conduct of the prosecutor was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" Darden v. Wainwright, 477 U.S. 168, 180 (1986) (quoting the lower court's opinion). Improper remarks by a prosecutor violate the Constitution only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). "Courts must conduct a fact-specific inquiry and examine the challenged comments in the context of the whole record." Bennett v. Stirling, 842 F.3d 319, 323 (4th Cir. 2016).

**(a)     Opening Statement**

The prosecutor's opening statement should be an objective summary of the evidence reasonably expected to be produced and the prosecutor should not use the opening statement as an opportunity to "poison the jury's mind against the defendant" or "to recite items of highly questionable evidence." United States v. DeRosa, 548 F.2d 464, 470 (3d Cir. 1977) (quoting Government of Virgin Islands v. Turner, 409 F.2d 102, 103 (3d Cir. 1969)). The direct expression of an advocate's opinion as to the veracity of a witness is prohibited. United States v. Moore, 710 F.2d 157, 159 (4th Cir. 1983). Although a prosecutor is not permitted to vouch for a witness' credibility, the prosecutor may submit that the jury may make conclusions based on the evidence. See United States v. Strickland, 702 Fed. Appx. 154 (4th Cir. 2017).

First, Petitioner contends that the prosecutor vouched for the confidential informant's veracity in the opening statement as follows:

> You'll hear from law enforcement that a break came in the case. That a tip came in from a confidential informant who had worked with Special Agent Rodney Blacknall in the past. You'll hear that this informant, whose name is Waymon Fleming, called and said, 'I heard there was a robbery where a lot of money was taken and I think my cousin might have been involved in that.'

> You will learn through presentation of the government's evidence that Agent Blacknall referred Mr. Fleming to Lieutenant Chad Moose with the Rowan County Sheriff's Department since the robbery had occurred in Rowan County. That's where the Beavers lived. **And you'll hear Mr. Fleming ended up being a very reliable confidential informant. He was correct, there had been a robbery and a lot of money had been taken and his cousin, a man named Leo McIntyre, Jr., was involved in that robbery**.

(3:12-cr-13, Doc. No. 287 at 159-60) (emphasis added).

Taken in context, the passage at issue submits that the jury should conclude that the information the confidential informant provided to police was credible because it was supported by the evidence. See Strickland, 702 Fed. Appx. at 154 (prosecutor did not engage in improper vouching or bolstering where it relied on the trial evidence to suggest, rather than assure, that a law enforcement witness was credible); see also United States v. Taylor, 900 F.2d 779, 782 (4th Cir. 1990) (it was "doubtful" that the prosecutor's statement that the confidential informant "is not lying in this business" was a direct expression of the attorney's opinion on credibility).

Second, Plaintiff argues that the prosecutor disparaged him through his association with Osman White as follows:

> The evidence will show that Roderick Hardin confessed. That Roderick Hardin told law enforcement everything. You will learn through testimony and presentation of documents and other evidence that Roderick Hardin told law enforcement how this whole scheme came about.

> And the web grew more tangled. Because Roderick Hardin told law enforcement that this was planned from the Mecklenburg County jail. That **a gentleman named Osman White – and I use that term 'gentleman' loosely –**

**was in the Mecklenburg County jail on drug charges. And Osman White had known defendant Tim Donahue for a long time**. Tim Donahue was from the Rowan County area. Tim Donahue worked in the glass business.

> And you're going to hear from Osman White. You're going to hear from the horse's mouth what happened. You're going to hear that Tim Donahue, the defendant in this case, approached Osman White and said, We should commit some robberies. I can't do it because I know these people.

(3:12-cr-13, Doc. No. 287 at 162) (emphasis added).

Osman White was incarcerated when the Government called him as a witness at Petitioner's trial. See (3:12-cv-13, Doc. No. 289 at 92). The prosecutor's comment that acknowledged Osman White's incarceration was not improper because the fact of his imprisonment was known to the jury. The fact that Osman White knew Petitioner, and that both were incarcerated at the time of trial, was properly before the jury and was not unduly inflammatory. Even if the comment was improper, it was isolated and did not render the trial fundamentally unfair. Compare United States v. Johnson, 415 Fed. Appx. 495 (4th Cir. 2011) (argument that "when you put the devil on trial, you've got to go to hell to get your witnesses," was improper because the attempt to defend its use of certain witnesses also made an inherent emotional characterization of the defendant, however, this single remark did not render the trial fundamentally unfair).

  **(b)** **Leading**

The essential test of a leading question is whether it suggests to the witness the specific tenor of the reply desired by counsel so that such a reply is likely to be given irrespective of an actual memory. United States v. Durham, 319 F.2d 590, 592 (4th Cir. 1963). The evil to be avoided is that of supplying a false memory for the witness. Id. The extent to which the use of leading questions may be indulged or limited is a matter primarily for the discretion of the trial judge and

an appellate court will intervene only if there is a clear abuse of discretion. Generally, abuse of discretion is not found in the absence of prejudice or clear injustice to the defendant. Id.

During victim Shirley Beaver's cross-examination, defense counsel Winiker asked whether she would recognize her business' website if she saw it. The prosecutor objected, stating:

> It's unclear at what point in time – this is not the website. This appears to be some sort of printout of portions of the website. **It's unclear – it appears that these were printed on December 3rd, 2012, which is far after the robbery**.

(3:12-cr-13, Doc. No. 288 at 81) (emphasis added).

The Court excused the jury and defense counsel argued that "the United States has clearly telegraphed to the witness potential responses in this speaking objection…." (3:12-cv-13, Doc. No. 288 at 84). The Court overruled the objection and defense counsel asked the witness whether she recognized the website printout and the witness agreed that the information pertaining to the business was correct but that she did not recognize it as being the company's website:

> [By Mr. Winiker]: … I was asking you if you could recognize that.
>
> A.  I mean, I recognize it as our – as our business and directions and all that being correct as far as the – how to get there, but, I mean …
>
> Q. Do you recognize it as the website for your business?
>
> A. (No response.)
>
> Q. Or do you know?
>
> A. I don't know because it's been a while since I've been on the business website. I haven't been on it in a while.

(3:12-cr-13, Doc. No. 288 at 88).

No leading occurred because the prosecutor's objection – that the printout was irrelevant because it post-dated the offense – did not supply Shirley Beaver with a false memory. Rather than testifying that the printout post-dated the offense, she admitted that the information was accurate

but that she did not know whether or not it was the business website because she did not view it often. See United States v. Durham, 319 F.2d 590, 594 (4th Cir. 1963) (no error occurred where no false answers were supplied by the prosecutor's questions, that defendant was not prejudiced, and that the district court did not abuse its discretion in overruling objections to the questions).

On Scott Beaver's direct examination, the following transpired:

Q. Now, Mr. Beaver, what happened after the scuffle? What was the robber's reaction to your resistance?

A. He just – he knew he had control of me again. And he said 'Come on, we're going to open the safe.' And of course, I had already told him okay, let's – because he – he acted like he was going to shoot me. The babies was still screaming and worrying about me because they had seen him kick and hit me. And he just seemed like he had it under control and so he told – I think the other guy was still tying – or had stopped during the scuffle, but then he finished tying up Shirley and made her lay in the floor.

And then he said 'Well, let's go.' So we went down towards the safe area.

Q. So you went with him and took him to the safe.

A. Yes, I took him to the safe.

Q. And is this the safe in the laundry room –

A. Yes, it is.

Q. – that you told us about earlier?

And was this safe in the direction that he had previously pointed to, saying 'I know you have a safe down there'?

A. Yes, it is.

Q. MR. WINIKER: Objection, leading.

THE COURT: Overruled, but don't lead.

(3:12-cr-13, Doc. No. 288 at 128-29)

No leading occurred because the witness had already testified about the location of the safe. The prosecutor's questions clarified that the events the witness recounted referred to the previously-described location and did not suggest an untrue answer. <u>Durham</u>, 319 F.2d at 594.

During Rodrick Hardin direct examination, the following transpired:

Q. Mr. Hardin, do you know Tim Donahue?

A. No, ma'am, I don't know him personally.

Q. Have you met Tim Donahue on the phone?

A. No, ma'am.

Q. You haven't spoken to Tim Donahue –

A. Oh, I'm sorry – excuse me. I'm confused.

Q. Okay. It's okay. I know it's probably – you're probably a little nervous.

A. You're saying Tim, but I'm looking at Mr. Beaver and it's messing me up.

But, yes, I know – I have spoken to Tim Donahue on the phone.

Q. And you've met Tim Donahue?

A. Yes, I have met Tim Donahue.

(3:12-cr-13, Doc. No. 289 at 224-25).

To the extent that the prosecutor led the witness in the foregoing exchange, it was not improper because the witness was confused and the prosecutor's questions clarified the testimony. <u>See</u> <u>Durham</u>, 319 F.2d at 594. Accordingly, Petitioner's arguments about improper leading are meritless and will be denied.

**(d)** **<u>Prison Garb</u>**

The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. <u>Drope v. Missouri</u>, 420 U.S. 162, 172 (1975). The presumption of innocence, although not

articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. Estelle v. Williams, 425 U.S. 501, 503 (1976). *Defendants* in a criminal trial may not be required to wear prison garb over their objection because it would deprive them of the presumption of innocence. See Estelle, 425 U.S. at 503-05. However, no such constraint applies to witnesses who wear prison attire while testifying. See Saenz v. Marshall, 990 F.2d 1260 (9th Cir. 1993).

Petitioner complains that the cooperating co-defendants testified in orange prison garb which informed the jury that they were convicted felons who were known to Petitioner. This argument fails because Estelle does not extend to witnesses and therefore no error occurred. See Pippen v. Curtin, 2014 WL 1344499 (E.D. Mich. April 4, 2014) (the Supreme Court has never held that the Constitution prohibits a witness from being compelled to testify in prison garb or visible restraints); see also Bates v. Carlton, 2012 WL 3524901 at * 14 (E.D. Tenn. Aug. 14, 2012) (counsel was not ineffective for failing to provide two incarcerated defense witnesses with civilian clothing at trial because due process attaches only to a defendant's right to testify in street clothing; "the individuals who wore jail garments were not defendants, were not on trial, and could not have served as a 'constant reminder of the *accused's* condition," so as to affect the jury's verdict as to *petitioner's* guilty or innocence."); Santiago-Vazquez v. United States, 2010 WL 2207751 (D.P.R. March 30, 2010) (denying claim that counsel was ineffective for failing to object when two cooperating government witnesses testified in prison uniforms because the due process presumption of innocence applies only to defendants, not witnesses). It was not improper to have witnesses testify in jail garb, and therefore, no prosecutorial misconduct occurred.

**(e)**     **Witness Tampering**

Improper witness intimidation may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to 'substantial government interference with

a defense witness' free and unhampered choice to testify." <u>United States v. Saunders</u>, 943 F.2d 388, 392 (4th Cir. 1991) (quoting <u>United States v. Hammond</u>, 598 F.2d 1008, 1012 (5th Cir. 1979)). If "a defendant is able to establish a substantial government interference, the inquiry moves to the question of whether it was prejudicial or harmless error." <u>Saunders</u>, 943 F.2d at 392.

First, Shirley Beaver testified on cross-examination that she met with Chad Moose a lot during the investigation, spoke to him for the last time three or four months before trial, and came back and updated them regarding what law enforcement had learned in the investigation including the arrest of a subject, how things were going in the investigation, the content of the phone conversations that law enforcement intercepted, and his theory about Petitioner supplying information to Osman White. (3:12-cr-13, Doc. No. 288 at 351-53). On cross-examination, Scott Beaver testified that Moose called him during the investigation and after arrests were made, would occasionally stop by, and would call and tell him what was progressing. (3:12-cr-13, Doc. No. 288 at 164-65). He agreed that, when defense counsel came out and asked if he was willing to talk to him, Beaver probably said "Anything I would tell you would be the worst, low down stuff I could about him. There's nothing good I can say about him. I know he's a hundred percent guilty and if you go deeper than that, hundred percent, he's that too" (3:12-cr-13, Doc. No. 288 at 173); and "you need to dig into what Moose has found." (3:12-cr-13, Doc. No. 288 at 174). He went on to testify that "Moose presented the facts so I think that's what you're supposed to believe is the facts." (3:12-cr-13, Doc. No. 288 at 174).

The Beavers' testimony about information Moose provided to them during the investigation fails to demonstrate that any substantial governmental interference occurred. The jury was able to consider Moose's contacts with them and weigh the Beavers' and Moose's credibility and potential bias accordingly.

Second, Chad Moose testified on cross-examination that he talked to Eric Wilson several times. He did not remember telling Wilson it would be best not for him to do anything to assist Petitioner's defense, and he denied telling Wilson not to talk to defense counsel. At some point he discussed jail phone calls and making more arrests with Scott Beaver but did not recall what he said. (3:12-cr-13, Doc. No. 289 at 19). Eric Wilson agreed on cross-examination that he probably told defense counsel the first time he came to see him that "[Moose] told [Wilson] it would be in [Wilson's] best interest not to say anything in [Petitioner's] defense." (3:12-cr-13, Doc. No. 290 at 38). Wilson spoke to Moose several times and kept him posted on what was going on in the case. On redirect, Wilson testified that he learned additional information about the Beaver robbery from Moose. (3:12-cr-13, Doc. No. 290 at 48).

Assuming that Moose's attempt to interfere with Wilson's testimony is true and amounts to substantial government interference, this claim fails because Petitioner has not shown prejudice. Wilson testified regarding Moose's alleged statements and appeared at trial notwithstanding his attempt to interfere. Petitioner fails to explain how Wilson's testimony was affected by Moose's actions and therefore, they were harmless. See, e.g., United States v. MacDonald, 32 F. Supp. 3d 608, 702 (E.D.N.C. 2014) (rejecting § 2255 interference claim where defendant failed to show, inter alia, that the witness was intimidated into altering her testimony).

Petitioner's argument that the foregoing indicates that the Court was concerned about Moose is not supported by the record. During the charge conference the prosecutor argued that the Investigative Steps instruction was unnecessary. Defense counsel requested the instruction except for the second paragraph stating, "[i]n short, law enforcement or investigative techniques are simply not your concern," because it might mislead the jury in deciding what law enforcement did was not their concern. (3:12-cr-13, Doc. No. 290 at 243). The Court denied the instruction because

the defense did not challenge law enforcement or investigative techniques. Rather, the defense "may have an argument you want to make about maybe one of the lieutenants in the case. But that doesn't mean that the investigative techniques themselves were suspect." (3:12-cr-13, Doc. No. 290 at 243-45). The Court's comments indicate only that the investigative steps instruction is inappropriate because the defense did not challenge the investigative techniques, and that counsel was free to attack Moose's credibility based on his interactions with the victims and witnesses.

### (f) Sequestration

The purpose and spirit underlying witness sequestration is to "discourage and expose fabrication, inaccuracy, and collusion." <u>Opus 3 Ltd. v. Heritage Park, Inc.</u>, 91 F.3d 625, 628 (4th Cir.1996); <u>see</u> Fed. R. Ev. 615 ("[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses….."). Put differently, sequestration helps to smoke out lying witnesses. "It is now well recognized that sequestering witnesses 'is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice.'" <u>United States v. Rhynes</u>, 218 F.3d 310, 318 (4th Cir. 2000) (<i>en banc</i>)(citing <u>Opus 3 Ltd.</u>, 91 F.3d at 628). Violations of Rule 615 are subject to the harmless error rule and thus, "an error in nonsequestration does not warrant per se reversal if the circumstances of a particular case illustrate clearly that the witness's testimony had no substantial influence on the verdict." <u>United States v. Harris</u>, 39 F.3d 1262, 1268 (4th Cir. 1994).

After returning from a break during jury selection, defense counsel informed the Court that he saw Moose stop and talked to the Beavers for at least five minutes and, as he walked by, he heard Moose say "Hardin" and "testify," and saw them gesturing and talking. (3:12-cr-13, Doc. No. 287 at 89-90). The prosecutor explained that she had spoken to Moose and had informed all the witnesses not to discuss the merits of the case. Moose had been coordinating with the Beavers

for administrative matters regarding what time to be here since the case seems to be moving a little slower, the fact that co-defendant Hardin pled guilty that morning so it was just Petitioner going to trial. (Id.). Moose confirmed to the prosecutor that he was not discussing any of the merits or the Beavers' testimony. (3:12-cr-13, Doc. No. 273 at 90). The Court concluded that, even if Moose and the Beavers had discussed the merits of the case, it could not have affected the trial because Moose had not seen or heard anything that was not part of the public record that he could have disclosed to the Beavers:

> THE COURT: … [E]ven if they were talking about the merits of the case, **nothing had happened in the courtroom that [Moose] saw**. He was in … **he was not even here for jury selection**. So he has seen nothing that has happened inside the courtroom that he's seen to report to them. And the plea is – I mean, that's public record. That's not anything – that's not anything – what's going to happen is – and I'm sure the reason you want him sequestered is that he's not going to be able to know some of the things that go on in here if that's to your advantage. And it's the same with the government, if you put on witnesses, they don't want your people talking about what happens.

 (3:12-cr-13, Doc. No. 92 at 181).

Because Moose did not see or hear any "testimony of other witnesses," his communication with the Beavers during a break in jury selection did not violate the purpose of Rule 615 and, to the extent it violated the Court's sequestration order, it was harmless.

**(g)     Burden Shifting**

It is improper for the prosecutor to imply that the burden of proof shifts to the defense. See generally United States v. Tanouie, 43 Fed. Appx. 568, 570 (4th Cir. 2002). Such an error is subject to harmless error analysis. See id.

After Rodney Blacknall's re-cross examination, defense counsel objected and asked for a limiting instruction because the jury was left with the impression that it was the defense's job to produce the materials that the witness reviewed on the computer but did not bring it to court.

Counsel's concern is that the jury was left with the impression that, once the United States complied with discovery, the burden somehow shifted to the defense. "[F]or instance, if I choose to criticize a witness for not bringing with him details or not being able to identify details from the record and relying simply on his memory from documents he looked at the day before, now the jury is left with the impression that it's my burden to produce those details for the witness to discuss. It is not. It's the government's burden." (3:12-cr-13, Doc. No. 289 at 81).

The Court entertained the parties' arguments then stated "… I don't know that they've shifted the burden to you, Mr. Winiker. You got into – you got into it and they were – it got a little bit far afield of how much … he was sending you." (3:12-cr-13, Doc. No. 289 at 83-84). After considering the matter during the break and reviewing the transcript, the Court declined to give an instruction because the burden was not shifted. (3:12-cr-13, Doc. No. 289 at 85-89). The Court instructed the Government not to leave the impression that the Government did something favorable by turning over the records to the defense rather than following normal procedure. (3:12-cr-13, Doc. No. 289 at 88-90). If the Court stated that, if it thought a burden was placed on the defense, it would have given an instruction but that did not occur. (3:12-cr-13, Doc. No. 289 at 90). However, when the Government stated during closing argument that Otis Sutton would have provided more details about the robbery, defense counsel objection, the Court sustained, and instructed the jury that "you're not to consider what some witnesses who the government chose not to have testify would have said." (3:12-cr-13, Doc. No. 291 at 50). At the close of arguments, the Court instructed the jury that "[t]he government has the burden of proving to you each element of the offenses charged beyond a reasonable doubt [and] [t]he defendant has absolutely no burden of proof." (3:12-cr-13, Doc. No. 291 at 57). The record reflects that no burden shifting occurred

and, even if it did, the Court's instructions during the argument and at the close of argument would have dispelled any jury confusion about the burden of proof.

    **(h)**     <u>**Closing Argument**</u>

A prosecutor's improper closing argument may "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." <u>United States v. Wilson</u>, 135 F.3d 291, 297 (4th Cir. 1998) (citation and internal quotation marks omitted). In determining whether a defendant's due process rights were violated by a prosecutor's closing argument, a court considers (1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial. <u>United States v. Lighty</u>, 616 F.3d 321, 359 (4th Cir. 2010). The second inquiry requires examination of the following factors to determine if a statement was prejudicial: (1) the degree to which the remarks had a tendency to mislead the jury and prejudice the defendant: (2) whether the remarks were isolated or extensive; (3) the strength of the evidence against defendant; (4) whether the comments were deliberately placed to divert the jury's attention; (5) whether the remarks were invited by defense counsel; and (6) whether the district court gave curative instructions to the jury. <u>United States v. Scheetz</u>, 293 F.3d 175, 186 (4th Cir. 2002).

First, Petitioner cites the prosecutor's mention that Hardin and Sutton are criminals and that Hardin testified in an orange jumpsuit:

> They pulled out these ropes and this belt and they tied this family up and they forced them onto the floor. And you heard Scott Beaver tell you, he was afraid for his life. You heard Shirley Beaver tell you that these men weren't wearing masks or disguising their identities and she thought they were going to die. And they did all of this, Hardin and Sutton, criminals – you heard from them. **You heard from Hardin: He's got convictions. He showed up in an orange jumpsuit**.

(3:12-cr-13, Doc. No. 291 at 10) (emphasis added).

The government apparently didn't pick the best witnesses since **the ones we put up were wearing orange jumpsuits because they were in jail**.

(3:12-cr-13, Doc. No. 291 at 46) (emphasis added).

It was not improper to call witnesses who were dressed in prison garb as explained in Section (d), *supra*. Petitioner fails to explain why commenting on their garb or the fact of their imprisonment, which was factually correct and known to the jury, was improper. See, e.g., United States v. Swain, 397 Fed. Appx. 893 (4th Cir. 2010) (the prosecutor's use of the term "fugitive" during two witnesses' testimony and during closing argument was not plain error where it was a factually accurate characterization of defendant's apprehension). Moreover, even if these comments were improper, they did not approach the level of emotionally-charged content that would deprive Petitioner of a fair trial, especially in light of the strong evidence of Petitioner's guilt. Compare United States v. Johnson, 415 Fed. Appx. 495 (4th Cir. 2011) (remark that "when you put the devil on trial, you've got to go to hell to get your witnesses" was an improper characterization of defendant but, although it was emotionally charged, this single comment did not render the trial fundamentally unfair).

Next, Petitioner argues that the following comments improperly vouched for the credibility of Government witnesses:

You heard from Agent Blacknall. **He is a long standing ATF agent with a great deal of credibility and he explained the system to you**.

(3:12-cr-13, Doc. No. 291 at 12) (emphasis added).

You heard Tim Donahue had a pattern of financial problems. He couldn't borrow any more money from Eric Wilson because Eric had already given him $20,000 that he hadn't repaid and he had stolen this four wheeler from Eric, so Eric obviously was not going to front any more cash. You heard from Tim Donahue's father that he wouldn't have given his son $20,000. He'd given him maybe a hundred here or there, but he had to pay it back. **Mr. Donahue was a very credible witness for his son**. **Mr. Donahue was a standup man**. And it's very -- … **Mr. Donahue came in and told you the truth** and the key truth there is that he wasn't

19

going to give his son any more money. If Tim had financial problems, Tim needed to solve them on his own. And how did Tim solve them? He solved them by targeting people he knew in the community. People who had money. People who had safes. People who kept cash. People who were vulnerable because they loved their wife and children.

(3:12-cr-13, Doc. No. 291 at 17-18) (emphasis added).

How do you known the Beavers are telling the truth? Because one of the jobs you have when you go back into that room is to determine what witnesses were telling the truth and what witnesses weren't. **The United States urges you that all of the witnesses we put on were telling the truth**. How do you know that? Because you should compare their testimony to each other and to other facts that you've seen.

(3:12-cr-13, Doc. No. 291 at 11) (emphasis added).

The foregoing arguments were not improper insofar as they urged the jury to conclude that these witnesses' testimony was credible. To the extent that any of these comments exceeded the bounds of propriety, they were harmless; the comments were isolated and brief and there was ample evidence to support Petitioner's conviction including cooperating co-conspirators' testimony and recorded phone conversations, some of which included Petitioner. United States v. Craddock, 364 Fed. Appx. 842 (4th Cir. 2010) (prosecutor's comments that witnesses "told the truth" was improper vouching but did not affect defendant's substantial rights so as to require reversal; the comments were isolated, brief, not deliberately placed before the jury to divert their attention to extraneous matters, merely reflected a poor choice of phrasing, and there was ample evidence to support defendant's conviction); United States v. Mason, 344 Fed. Appx. 851 (4th Cir. 2009) (comments vouching for witnesses and referring to facts not in evidence was not plain error given the strength of the government's case and the fact that those witnesses were mostly redundant, and jury was instructed to rely on its recollection of the evidence); United States v. Lawson, 64 Fed. Appx. 380 (4th Cir. 2003) (assuming that the prosecutor made vouching remarks,

they were not plain error given their isolated nature and the overall strength of the government's case).

Because Petitioner's claims of prosecutorial misconduct are meritless, counsel was not deficient for failing to raise them and they are not prejudicial. Therefore, Petitioner's claims of prosecutorial misconduct are dismissed with prejudice as procedurally defaulted from § 2255 review and, alternatively, are denied on the merits.

**(4)**      <u>**Ineffective Assistance of Counsel**</u>

Plaintiff alleges that trial counsel was ineffective for: (a) failing to investigate or call three potential defense witnesses at trial; (b) repeatedly filing motions at the last minute; and (c) being inattentive and distracted by emails and text messages on his cell phone during trial.

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. <u>See</u> U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." <u>Id.</u> at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>, 466 U.S. at 689).

**(a)**      <u>**Failure to Call Defense Witnesses**</u>

Petitioner contends that counsel failed to call at trial three witnesses who Petitioner identified as able to assist in his defense. He claims that counsel made no effort to communicate with these witnesses to strategically assess their value to the defense. In his Reply, Petitioner

identifies the potential witnesses as Untearda Ray Massey, A.J. Arrington, and John Wayne West. He claims that all three witnesses were housed in Rowan County Jail and were assigned to the same dorm as cooperating co-defendant Hardin. He claims that these witnesses "would have attested to the fact that Hardin stated that he did not know the defendant, had never met the defendant and that Donahue … had nothing to do with the robbery" and that "Hardin … would do anything to help himself and that he had phoned [Donahue] in the hopes of landing a job with him in [Donahue's] auto glass business and hoping that Hardin might get an opportunity to see the junkyard if he was to go/accompany there as part of the auto glass repair services." (Doc. No. 6 at 4). Petitioner argues that this testimony would have impeached Hardin's trial testimony.

Attorneys have wide latitude in determining which witnesses to call as part of their trial strategy. See generally Pruett v. Thompson, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993) (decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce."). To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced, show that the witness would have been willing to testify, and show that the testimony would have created reasonable doubt as to the defendant's guilt. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996); Spencer v. Murray, 18 F.3d 229, 236 (4th Cir. 1994). Failure to investigate a crucial witness may suggest ineffective assistance of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to

investigate such a defense is not prejudicial. <u>See</u> <u>Savino v. Murray</u>, 82 F.3d 593, 599 (4th Cir. 1996).

Petitioner's claim is facially insufficient insofar as Petitioner fails to show that the witnesses would have been willing to testify. <u>See</u> <u>generally</u> <u>United States v. Dyess</u>, 730 F.3d 354 (4th Cir. 2013) (petitioner failed to show deficient performance where petitioner only offered speculative conclusions about who counsel failed to call and what aid their testimony would have provided to the defense). Moreover, counsel cannot be deemed deficient for failing to investigate these three witnesses because their purported testimony was potentially harmful to the defense. Petitioner's alleged statements to these individuals is contradictory insofar as he asserted that he did not know Donahue yet he also said that he had contacted Donahue about getting a job. Counsel also could have concluded that relying on the testimony of imprisoned individuals as witnesses would have undermined the theory of defense which was insufficient evidence due to Hardin's lack of credibility due, in part, to his criminal record. <u>See</u> (3:12-cr-13, Doc. No. 291 at 21) (defense counsel arguing in closing "we've got Osman White and Roderick Hardin, and the government wants you to believe them."); (3:12-cr-13, Doc. No. 291 at 29) ("the judge is going to instruct you why Mr. Hardin's testimony should be carefully considered by you, why I argue it's not credible to you. He's a prior convicted felon."); <u>see</u> <u>generally</u> <u>United States v. Dehlinger</u>, 740 F.3d 315 (4th Cir. 2014) (no adverse effect results from a trial lawyer's decision not to call witnesses whose testimony would be cumulative or potentially damaging to a defendant's case). Moreover, even if the three witnesses were willing to testify and would have provided the testimony alleged by Petitioner, no prejudice resulted due to the strong evidence of Petitioner's guilt.

Counsel cannot be deemed ineffective for failing to investigate or call the three witnesses proposed by Petitioner under these circumstances and this claim is denied. <u>See</u> <u>generally</u> <u>Knowles</u>

v. Mirzayance, 556 U.S. 111, 123 (2009) ("this Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success.").

**(b)** **Untimely Motions**

Petitioner contends that defense counsel repeatedly filed last-minute motions that were crucial to his defense. Specifically, counsel filed a Bruton[2] motion the weekend immediately before the start of trial seeking to redact cooperating co-defendant Hardin's videotaped confession to police, and counsel filed a Motion *In Limine* mid-trial concerning Eric Wilson's testimony that defense counsel had known about for at least six months.

First, counsel cannot be deemed ineffective for his late Bruton motion. The Bruton rule provides that a defendant is deprived of his confrontation rights when a co-defendant's incriminating confession is introduced at their joint trial even if the jury is instructed to consider the confession only against the co-defendant. Even if counsel was deficient for filing the Bruton motion on the eve of trial, he cannot demonstrate prejudice because the Court considered the motion as though it was timely. Moreover, prejudice is impossible because Bruton is factually inapplicable. Co-defendant Hardin entered a plea prior to Petitioner's trial and testified against him. There was no joint trial and Petitioner's right to confront Hardin was not violated. See United States v. Dargan, 738 F.3d 643 (4th Cir. 2013) (defendant's reliance on Bruton was misplaced where defendant and co-defendant were not tried jointly and therefore there was no substantial risk that a confession admitted against one defendant might affect the jury's verdict regarding his co-defendant).

Second, Petitioner has failed to establish ineffective assistance with regards to the Motion *In Limine* regarding Eric Wilson's testimony. Counsel filed a Motion seeking to exclude

---

[2] Bruton v. United States, 391 U.S. 123, 126 (1968).

statements of Eric Wilson regarding allegations that he had loaned Petitioner $20,000 that had not been repaid, that Petitioner took a four-wheeler from him that was never returned, and that he suspected Petitioner was using drugs. See (Doc. No. 170). The Court heard argument on the motion setting "[t]imeliness aside." (3:12-cr-13, Doc. No. 289 at 5). The drug issue was moot because Government stated that it did not intend to introduce testimony from Lieutenant Moose that Wilson suspected Petitioner of using drugs. (3:12-cr-13, Doc. No. 289 at 5). As to the $20,000 debt and four-wheeler, the Court found that evidence of Petitioner's financial trouble may be relevant to his motive to commit robbery but cautioned the Government not to go into unfair topics like the witness' speculation. (3:12-cr-13, Doc. No. 289 at 10). Petitioner has failed to show that he suffered any prejudice due to the late filing because the Court considered part of the Motion on the merits despite its late filing and the remainder of the Motion was moot. Petitioner's claims of ineffective assistance of counsel due to late-filed motions will therefore be denied.

### (c) Distractions

Finally, Petitioner contends that counsel was distracted by his cell phone and emails throughout the trial was essentially a lack of counsel during the critical stages of trial. Due to his distraction, counsel failed to object when the prosecutor led the Government's key witness, Hardin, and counsel failed to object when the Court stated during jury instructions that Petitioner pled guilty at arraignment. (Doc. No. 1-1 at 20).

There is a narrow exception to Strickland's prejudice prong where a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial." Bell v. Cone, 535 U.S. 685, 695 (2002). This exception applies when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S.

648, 658 (1984). <u>Cronic</u> applies "when ... the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," <u>Id.</u> at 659-660. One circumstance warranting the presumption is the "complete denial of counsel," that is, when "counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." <u>Wright v. Van Patten</u>, 552 U.S. 120, 124-25 (2008) (quoting <u>Cronic</u>, 466 U.S. at 659).

Petitioner's suggestion that counsel was so distracted that he was essentially deprived counsel at trial is not supported by the record. Assuming that counsel was distracted from time to time during trial, this was not the complete absence and utter abandonment that would amount to a deprivation of counsel. Petitioner does not allege that counsel was absent or asleep, failed to subject the prosecution's case to meaningful adversarial testing, or deprived him of the opportunity to confer or obtain legal advice. <u>See</u> <u>generally</u> <u>United States v. Ragin</u>, 820 F.3d 609 (4th Cir. 2016) (finding that a defendant would suffer <u>Cronic</u> prejudice if his lawyer was asleep during a substantial portion of trial because an unconscious attorney cannot consult with his or her client or provide informed guidance during the course of trial). Therefore, the <u>Strickland</u> standard applies and Petitioner must demonstrate deficient performance as well as prejudice.

With regards to the lack of objection to the Government's leading questions, reasonable counsel could have decided not to object because no improper leading occurred, and because the line of questioning merely clarified Hardin's testimony. <u>See</u> Section (1)(b), *supra.* Petitioner has failed to demonstrate either deficient performance or prejudice under these circumstances. Counsel cannot be deemed ineffective for failing to object under these circumstances. <u>See</u> <u>generally</u> <u>Knowles</u>, 556 U.S. at 123 ("this Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success.").

With regards to the jury instructions, it is evident that no error occurred and, even if it did, there is no way the jury could have been confused about the misstatement. During jury instructions, the Court stated:

> At arraignment the defendant entered a plea of **guilty** to these charges and **thereby made a general denial** of all of the accusations contained in the superseding bill of indictment. It is therefore up to you, the jury, to decide if, in fact, the defendant is guilty or not guilty of the charges outlined in the superseding bill of indictment.

(3:12-cr-13, Doc. No. 291 at 57) (emphasis added).

The jury instructions as given reflect that the Court instructed the jury that Petitioner pled "not guilty."[3] Therefore, there was no error to which counsel should have objected. See <u>Knowles</u>, 556 U.S. at 123 ("this Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."). Moreover, even if the Court had misspoken, such an obvious and unintentional error could not have prejudiced Petitioner because the jury knew that Petitioner had pled not guilty, contested the Government's evidence, and maintained his innocence when he testified at trial. Therefore, Petitioner's ineffective assistance claim will be denied.

## IV.     CONCLUSION

For the foregoing reasons, the Motion to Vacate is dismissed with prejudice as procedurally defaulted from § 2255 review and denied and denied on the merits.

**IT IS, THEREFORE, ORDERED** that:

---

[3] The Court takes judicial notice of the "as given" jury instructions as they are part of the Court's file. <u>See</u> Fed. R. Ev. 201. The Clerk of Court will be instructed to make the "as given" jury instructions a part of the Court's file in the instant case in a separate order.

1.      The Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DISMISSED** with prejudice and **DENIED**.

2.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: April 5, 2019

Max O. Cogburn Jr.
United States District Judge